**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-3168
_____

ILDAR RUZMETOVICH NIYAZOV,
Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS
(Agency No. A240-827-555)
Immigration Judge: Adam Panopoulos
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
on September 9, 2025

Before: HARDIMAN, KRAUSE, and FREEMAN, *Circuit Judges*

(Opinion filed: August 6, 2026)

_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

FREEMAN, *Circuit Judge*.

Ildar Ruzmetovich Niyazov petitions for review of an order of the Board of Immigration Appeals (BIA) denying his claims for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). During Niyazov's *pro se* hearing before the Immigration Judge (IJ), the IJ failed to develop the record on issues he found dispositive, leaving us unable to determine whether substantial evidence supports his factual findings.

To be clear, we do not require IJs to exhaust every possible line of inquiry in a hearing. But the Immigration and Nationality Act (INA) requires IJs to "receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses." 8 U.S.C. § 1229a(b)(1). And to comply with that statutory mandate, IJs must develop the record with respect to evidence a *pro se* applicant raises that would be favorable to him. The IJ did not do that here. Instead, he left unexplored several references Niyazov made in his testimony and declaration to incidents that were highly relevant to his claims for relief, including incidents of ethnic discrimination and the suspicious killing of his sister in his presence. We will therefore grant the petition, vacate the BIA's order, and remand to the BIA with instructions to remand to the IJ for a new hearing.

**I.**

Niyazov is a native and citizen of Uzbekistan. He was born in 1975 and is part of the Tatar ethnic minority.

In May 2022, Niyazov presented himself at a United States port of entry as an applicant for admission, and he was paroled into the country along with his wife and two

2

minor children.  Eighteen months later, the Department of Homeland Security (DHS) arrested and detained him, charging him with inadmissibility for lack of valid entry and travel documents.[1]  8 U.S.C. § 1182(a)(7)(A)(I).

While detained, Niyazov applied *pro se* for asylum, withholding of removal, and CAT protection.  He submitted a declaration and materials in support of his application, and he appeared *pro se* at a hearing before an IJ.[2]  The IJ found Niyazov credible and also credited Niyazov's wife's affidavit and letter regarding the family's treatment in Uzbekistan.  The IJ noted that any inconsistencies between Niyazov's declaration and his testimony were "natural" for someone who had experienced numerous instances of past mistreatment and harm.  App. 14.

Niyazov's testimony and the materials he presented to the IJ chronicled his life in Uzbekistan, where the citizenry shunned him since his early childhood because of his

---

[1] DHS's Form I-213 states that Niyazov was the subject of a human trafficking investigation.  Niyazov was not charged with or convicted of any crime, and DHS presented no evidence of criminal wrongdoing at his immigration hearing.

[2] The dissent says the IJ held "six appearances, including two hearings," in this case. Dissent at 15.  Yet the total time the IJ devoted to hearing the merits of Niyazov's case was three hours, much of which was taken up by the live interpretation.  At Niyazov's first appearance, the proceedings could not move forward for lack of an appropriate interpreter, and the second and third appearances were master calendar hearings, not merits hearings.  At his fourth appearance (the first scheduled merits hearing), the hearing terminated shortly after it began because Niyazov needed an opportunity to get his documentary evidence translated into English.  The merits hearing resumed in earnest during the fifth appearance, but the IJ had to stop receiving evidence halfway through the three-hour allotted time because the interpreter had to leave.  The IJ then completed the merits hearing during Niyazov's sixth appearance.

ethnicity. He changed schools several times before ultimately dropping out of school because he was unable to bear the ethnic discrimination.

Niyazov fared no better in his adulthood. He suffered numerous beatings by members of the majority Uzbek ethnic group who jeered at his Tatar ethnicity and told him to "get out of [their] country." AR 282. He was also beaten at work and fired from several jobs because he was a Tatar. Although he reported the beatings to the police, they never helped him; instead, the police always sided with the Uzbeks. These experiences led Niyazov to take up political activism advocating for Tatar rights in Uzbekistan.

In 2002, Niyazov married a woman who is part of the Tajik ethnic minority. The couple was repeatedly attacked by neighbors and coworkers because of their ethnicities and their perceived religion—an observance of Islam that did not conform to the Uzbek majority's conservative Islamic faith. During some of these attacks, Niyazov and his wife sustained head injuries. As he did with the beatings motivated by his ethnicity, Niyazov reported the beatings on the basis of his religion to the police. Again, they failed to help him.

In 2010, Niyazov bought a house in Tashkent, the capital of Uzbekistan, from the family of a government official. A few years later, he learned that the seller had provided him with fake documents for the house, which concealed the fact that the house was noncompliant with local codes. Local government authorities informed Niyazov of the noncompliance and tried to coerce him to give up the house. Niyazov resisted their efforts, refusing to abandon his house and filing a complaint with the Supreme Court of

4

Uzbekistan.[3]  The authorities responded to Niyazov's resistance with physical abuse. They detained Niyazov on three occasions—once for a period of three full days—and beat him with metal sticks while questioning him.  After those periods of detention, local officials continued to intimidate and threaten Niyazov and his family as part of their effort to seize Niyazov's house.  They issued Niyazov citations that came with fees so high they were impossible to pay.  They also sent a crew of demolition workers to the house to forcibly remove the family.  The workers did so by beating the family members. They did not spare Niyazov's wife from the beating even though she was holding the couple's newborn child.

In 2015, a court ordered the demolition of the part of Niyazov's house that was not compliant with local codes, leaving it without a kitchen or bathroom.  The condition of the house caused Niyazov to take his wife and minor children to stay with his sister in Xorazm, a city Niyazov estimates to be 1,200 kilometers from Tashkent.

Niyazov had been staying in Xorazm for two or three months when he, his wife, and his sister were victims of a suspicious hit-and-run car crash.  While Niyazov was driving, someone called his sister's cell phone and instructed the family to pull over the car.  The car behind them then signaled with its headlights for them to pull over. Niyazov refused to pull over, and the car behind them crashed into his car and fled the scene.  Niyazov's car flipped over, and his sister was killed.  Niyazov does not know the identity of the perpetrators, but he testified that he suspected the crash "was a setup" by

---

[3] The Supreme Court of Uzbekistan dismissed Niyazov's complaint.

5

the authorities. AR 255. The police responded to the scene but falsely accused Niyazov of being intoxicated.

After his sister's death, Niyazov and his wife and minor children returned to their partially demolished house in Tashkent. There, authorities continued to target Niyazov, luring him to the police station under false pretenses then beating him to try to coerce him into giving up the apartment where his adult son was living. Although he told the police about the authorities' coercion and beatings, the police refused to help him and did not allow him to file a complaint.

Niyazov also faced targeted attacks at his job in Tashkent. His coworkers repeatedly insulted his ethnicity, and on one occasion they attacked him by using a key to etch a mark into his forehead. Like with his previous jobs, Niyazov stopped working at that job because of this attack, but the violence followed him home. Neighbors accosted Niyazov at his partially demolished house and attacked him because of his religion. For the same reason, they also beat Niyazov's wife with a large wooden stick in a separate incident.

In 2021, after suffering these attacks, Niyazov moved his family to Samarkand, which is approximately 300 kilometers from Tashkent. He, his wife, and his minor children stayed with his wife's relatives in Samarkand for almost a year, but those relatives did not accept Niyazov because of his Tatar ethnicity. Meanwhile, he continued to face significant discrimination outside of the home, which Niyazov attested was even worse than what he had suffered in other parts of Uzbekistan. Among other things, while

6

working as a taxi driver, more than one of his passengers spat on his face when they realized he was Tatar.

The government officials who targeted Niyazov in Tashkent threatened to track him down anywhere in Uzbekistan. There are indications that they are following through on that threat: Niyazov's adult son still lives in Uzbekistan, moving between cities, and he continues to get inquiries about Niyazov's whereabouts.

At the conclusion of Niyazov's removal hearing, the IJ found Niyazov's testimony credible and determined that Niyazov had suffered persecution and torture based on protected grounds. The IJ based his determinations on several factual findings, including that authorities targeted Niyazov because of his ethnicity and perceived political opposition and sought to coerce him into relinquishing his house; that authorities detained, beat, and psychologically abused Niyazov (along with his adult son); and that the suspicious hit-and-run car crash that killed Niyazov's sister may have been a targeted action intended to intimidate Niyazov. The IJ also found that Niyazov and his wife were repeatedly attacked based on their perceived religion, and that the extensive ethnic discrimination Niyazov experienced throughout his life was consistent with the mistreatment of the Tatar minority in Uzbekistan.

Despite these findings, the IJ denied Niyazov's application for asylum and withholding of removal because he concluded that "DHS ha[d] met its burden of rebutting the presumption of a well-founded fear of future persecution by demonstrating that the respondent has successfully internally relocated in the past and would be able to

7

do so in the future." App. 16. Specifically, the IJ found that DHS had demonstrated that relocation to Samarkand was reasonable.

The IJ also denied humanitarian asylum because he deemed the persecution and torture Niyazov suffered insufficient to merit that relief.[4] Finally, although the IJ determined that Niyazov suffered past torture, the IJ denied CAT protection based on his finding that there was "very little likelihood of [Niyazov] experiencing torture again." App. 23. Having denied all relief from removal, the IJ ordered Niyazov removed to Uzbekistan.

The BIA affirmed the IJ's decision and dismissed Niyazov's *pro se* appeal. The BIA agreed that DHS had carried its burden of rebutting the presumption of future persecution based on Niyazov's relocation within Uzbekistan, so it deemed Niyazov ineligible for asylum and withholding of removal. It held that Niyazov had waived any challenge to the IJ's denial of humanitarian asylum by failing to make "any meaningful arguments on appeal." App. 6 n.2. As to CAT protection, the BIA, unlike the IJ, concluded that the past persecution Niyazov suffered did not rise to the level of torture, but it affirmed the IJ's finding that Niyazov did not establish a likelihood of future torture because he could safely relocate within Uzbekistan.

With the assistance of counsel, Niyazov filed this timely petition for review.

---

[4] Humanitarian asylum refers to a grant of asylum under 8 C.F.R. § 1208.13(b)(1)(iii) based on either the severity of past persecution or the reasonable probability of other serious harm in the future. *Pllumi v. Att'y Gen.*, 642 F.3d 155, 162 (3d Cir. 2011); *Matter of L-S-*, 25 I. & N. Dec. 705, 710 (BIA 2012).

8

**II.**[5]

We will grant Niyazov's petition, vacate the BIA's order, and remand to the BIA

with instructions to remand to the IJ for a new hearing on Niyazov's application for

asylum (including humanitarian asylum), withholding of removal, and CAT protection.[6]

A.

Article III judges and IJs have distinct roles. IJs are members of the Executive

Branch, not the Judicial Branch. *See United States v. Dohou*, 948 F.3d 621, 624 (3d Cir.

2020) (distinguishing between the role of Article III judges and administrative officials

like IJs, who make "nonjudicial" or "quasi-judicial" decisions). They are appointed by

---

[5] We have jurisdiction to review this timely-filed petition for review of a final order of removal under 8 U.S.C. § 1252(a)(1) and (5). Because "the BIA affirm[ed] and partially reiterate[d] the IJ's discussions and determinations, we look to both decisions." *Myrie v. Att'y Gen.*, 855 F.3d 509, 515 (3d Cir. 2017). We exercise plenary review over legal determinations. *Serrano-Alberto v. Att'y Gen.*, 859 F.3d 208, 2113 (3d Cir. 2017).

[6] As a threshold matter, the government's exhaustion arguments fail. We employ a "liberal exhaustion policy where [a noncitizen] need not do much to alert the [BIA] that he is raising an issue." *Nunez v. Att'y Gen.*, 35 F.4th 134, 142 (3d Cir. 2022) (cleaned up). "So long as an immigration petitioner makes some effort, however insufficient, to place the BIA on notice of a straightforward issue being raised on appeal, he meets the exhaustion requirement." *Inestroza-Tosta v. Att'y Gen.*, 105 F.4th 499, 520 (3d Cir. 2024) (cleaned up). Niyazov argued to the BIA that DHS failed to carry its burden to rebut the presumption of a well-founded fear of future persecution. Thus, he exhausted his challenge to the future-persecution findings. Niyazov also argued to the BIA that the IJ erred in denying his claim for humanitarian asylum, so he did not waive or forfeit that challenge. The BIA abused its discretion in determining otherwise. *See Matter of Voss*, 28 I. & N. Dec. 107, 108 n.2 (BIA 2020) (noting that a challenge to the IJ's decision is properly deemed waived when it is *not* raised on appeal); *Sanchez v. Att'y Gen.*, 147 F.4th 348, 352 (3d Cir. 2025) (reviewing the BIA's waiver determinations for an abuse of discretion).

9

the Attorney General to conduct certain proceedings under the INA. 8 U.S.C. § 1101(b)(4).

The INA governs IJs' role in removal proceedings. Among other things, the INA provides that "[t]he immigration judge shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses." 8 U.S.C. § 1229a(b)(1). In view of this explicit statutory directive for the IJ to question the alien and any witnesses, an IJ, "[u]nlike an Article III judge . . . is not merely the fact finder and adjudicator but also has an obligation to establish the record" in removal proceedings. *Yang v. McElroy*, 277 F.3d 158, 162 (2d Cir. 2002) (citing § 1229a(b)(1)); *see also Buckley v. Blanche*, -- F.4th --, No. 24-1957, 2026 WL 1506399 (1st Cir. May 29, 2026) ("[I]t is an IJ's statutory duty to assist in developing a sufficient record at the merits hearing . . . ." (citation modified)); *Diahn v. Blanche*, 175 F.4th 291, 301 (4th Cir. 2026) (citing § 1229a(b)(1) for immigration judges' statutory duty to develop the record in removal proceedings); *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, 174 F.4th 81, 96 (D.C. Cir. 2026) (observing that "the immigration judge has an affirmative duty to develop a record" in removal proceedings under § 1229a(b)(1)); *Abdurakhmanov v. Holder*, 735 F.3d 341, 346 n.4 (6th Cir. 2012) ("An IJ has not only an ability, but an obligation, to ask questions of the alien during the hearing to establish a full record." (citing § 1229a(b)(1))); *Lacsina Pangilinan v. Holder*, 568 F.3d 708, 709 (9th Cir. 2009) (explaining that the obligation to develop the record is "founded on [the IJ's] statutory duty" in § 1229a(b)(1)).

10

Our precedent also acknowledges that this statutory obligation imposes on an IJ the "duty to develop an applicant's testimony, especially regarding an issue that she may find dispositive." *Toure v. Att'y Gen.*, 443 F.3d 310, 325 (3d Cir. 2006). We have held, too, that an IJ cannot "fault [a *pro se* applicant] for not volunteering" additional details in his testimony if the applicant "answered those questions he was asked at the hearing" and the IJ failed to ask questions to elicit further detail. *Senathirajah v. INS*, 157 F.3d 210, 220 (3d Cir. 1998) (observing that the reason for the petitioner's "purported failure to provide greater detail" was that "[h]e was not asked"); *id*. at 222 (concluding the IJ's adverse determination was not supported by substantial evidence). In that scenario, the IJ, in effect, fails to develop the record. *See also Toure*, 443 F.3d at 325; *Saravia v. Att'y Gen*., 905 F.3d 729, 736–38 (3d Cir. 2018*)* (noting the importance of the IJ's duty to develop the record and remanding where the IJ did not provide petitioner with notice or opportunity to provide corroborating evidence or explain its unavailability on the record). And we have also observed that "the Immigration Judge's obligation to develop the record takes on particular importance where a respondent in removal proceedings is not provided counsel." *Saravia*, 905 F.3d at 736 n.33.

Additionally, our precedent is clear that the IJ cannot ignore evidence that is favorable to the applicant. *See, e.g.*, *Herrow v. Att'y Gen.*, 93 F.4th 107, 116 (3d Cir. 2024) ("The IJ need not address every piece of evidence in the administrative record, but it cannot ignore evidence favorable to [the petitioner]."); *Huang v. Att'y Gen.*, 620 F.3d 372, 388 (3d Cir. 2010) (similar).

Putting these lines of precedent together, the IJ must develop the record with respect to evidence a *pro se* applicant raises that would be favorable to him. This duty obligates the IJ—once alerted to a potentially relevant circumstance by a *pro se* applicant—to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Diahn*, 175 F.4th at 301 (citation modified). We have not addressed the bounds of an IJ's duty when a noncitizen is represented by counsel, and we have no occasion to do so today.

We review the IJ's factual findings under the deferential substantial-evidence standard. *Toure*, 443 F.3d at 316. But when an IJ has not fulfilled his statutory duty to develop the evidence, the record itself is deficient. Because that leaves us unable to determine whether substantial evidence supports his factual findings, we remand for further proceedings. *See id*. at 325 (explaining it is "impossible" to apply the substantial evidence standard where petitioner was not given the opportunity to testify to the relevant issues); *Senathirajah*, 157 F.3d at 222 (concluding that an adverse credibility determination was not supported by substantial evidence where the immigration judge failed to develop the record on the issues in question).

B.

The IJ failed to fulfill his duty to develop the record in Niyazov's case. As explained below, Niyazov referenced incidents that were relevant to past persecution and whether he could safely and reasonably relocate within Uzbekistan. Yet the IJ not only failed to probe into those incidents, but also, on multiple occasions, redirected the questioning as Niyazov attempted to describe an attack or injury.

12

1.

Because Niyazov established past persecution, he was presumed eligible for asylum and withholding of removal. 8 C.F.R. §§ 1208.13(b)(1)(ii), 1208.16(b)(1)(ii). To overcome that presumption, it was DHS's burden to prove by a preponderance of the evidence that Niyazov "could avoid future persecution by relocating to another part" of Uzbekistan and that "under all the circumstances, it would be reasonable to expect [him] to do so." 8 C.F.R. §§ 1208.13(b)(1)(i)(B), 1208.16(b)(1)(i)(B); *see also Matter of M-Z-M-R-*, 26 I. & N. Dec. 28, 34 (BIA 2012) (explaining internal relocation must be safe and practical). The IJ failed to apply this presumption favoring Niyazov. Instead, the IJ presumed that, because Niyazov had relocated within Uzbekistan before, he could safely and reasonably do so again.[7] But Niyazov made several statements during his hearing and in his written materials that suggested relocation was not safe or reasonable for him and his family, and the IJ repeatedly failed to ask pertinent questions about those statements. The indicia of reasonableness that Niyazov raised, but the IJ failed to develop, include but are not limited to the following:

(a) The treatment of the Tatar ethnic minority in potential areas for relocation. In testimony that the IJ credited, Niyazov explained that the discrimination he faced never

---

[7] The IJ found it was reasonable for Niyazov to internally relocate to Samarkand, and only the BIA addressed relocation to Xorazm. Because the BIA cannot find facts for itself, there is therefore no factual finding about the reasonableness of relocation to Xorazm. *See Alimbaev v. Att'y Gen.*, 872 F.3d 188, 195–200 (3d Cir. 2017); 8 C.F.R. § 1003.1(d)(3)(i), (iv). In any event, remand is necessary because the IJ failed to develop the record on key facts relevant to the reasonableness of relocation to either Xorazm or Samarkand.

13

ceased from his early childhood until he left Uzbekistan. He also testified and noted in his declaration that the anti-Tatar discrimination he faced in Samarkand was even worse than what he had endured in other parts of Uzbekistan. Yet the IJ did not ask Niyazov for details about the discrimination he faced in Samarkand.[8]

(b) The safety of Niyazov's adult son (whom the police previously detained and beat for multiple days) and the inquiries the son gets about Niyazov's whereabouts. Niyazov testified that his adult son frequently relocates within Uzbekistan to avoid harm and is still asked about his father's whereabouts. The IJ did not ask for any details about why the son feels compelled to relocate or who questions the son about his father's whereabouts.

(c) Which actors were involved in the suspicious 2015 hit-and-run car crash that killed Niyazov's sister while the family was staying in Xorazm. After the IJ read his oral decision, Niyazov asserted that the IJ did not understand the circumstances surrounding

---

[8] The dissent says the IJ did not need to inquire further about "family problems" between Niyazov and his in-laws in Samarkand or Niyazov's children's trouble "adjust[ing] to school in a new region." Dissent at 11. But the BIA instructs that "adjudicators should consider . . . social and cultural constraints, such as . . . social and familial ties" when determining whether internal relocation would be reasonable. *Matter of M-Z-M-R-*, 26 I. & N. at 34–35. So when Niyazov recounted that his in-laws discriminated against him *because he is Tatar*, and that his children could not get along with others in Samarkand because of the style of their speech, those topics required further inquiry.

The dissent also says the IJ need not have inquired into the "occasional gross acts" of passengers in Niyazov's taxi. Dissent at 11. But *spitting on Niyazov's face out of ethnic hatred* is not just gross. It is assaultive behavior that supports the need for further inquiry into whether relocation to Samarkand would be safe, practical, and reasonable under all the circumstances. *See* 8 C.F.R. §§ 1208.13(b)(1)(i)(B), 1208.16(b)(1)(i)(B); *Matter of M-Z-M-R*, 26 I. & N. Dec. at 30, 34.

the hit-and-run crash. He explained that the crash "was a setup by them because of those arguments among us." AR 255. At no point during the proceedings did the IJ inquire about who was responsible for the crash and whether those actors were affiliated with the government.

(d) Niyazov's political activities for Tatar rights. When Niyazov applied for asylum and withholding of removal, he stated that he would be harmed in Uzbekistan because of his ethnicity and because of his fight for Tatar rights. The IJ made no inquiries into the nature or extent of Niyazov's political activities on behalf of Tatar rights and what harm or threats may have resulted from those activities.

(e) The treatment of the Tajik ethnic group in potential areas of relocation. As the IJ found, Niyazov is the head of a household who seeks a safe place to live with his wife and the couple's minor children. Both adult members of the family attested to the discrimination the family has faced because of Niyazov's wife's Tajik ethnicity, but the IJ did not inquire about how her ethnicity—or the ethnicity of the couple's children— might affect the reasonableness of internal relocation. *See Matter of M-Z-M-R-*, 26 I. & N. at 34–35 (stating that adjudicators should consider whether issues including "social and cultural constraints" and "social and familial ties" impact the reasonableness of internal relocation).

Absent an adequate record, we cannot determine whether the IJ's findings about internal relocation are supported by substantial evidence; undeveloped details would be directly relevant to Niyazov's position that he could not safely and reasonably relocate

15

within Uzbekistan if returned.[9]  *See Gambashidze v. Ashcroft*, 381 F.3d 187, 193 (3d Cir. 2004) (remanding for further factfinding where the record "says virtually nothing" that supported the determination that the petitioner was previously able to successfully relocate internally).  Accordingly, we will remand for further factfinding as to the feasibility and reasonableness of internal relocation in Uzbekistan.[10]

---

[9] The dissent appears to contend that it was reasonable for Niyazov to relocate to Samarkand or Xorazm because the IJ found that Niyazov: (a) did not experience past harm amounting to persecution in those parts of Uzbekistan, Dissent at 11–12, and (b) is unlikely to suffer future persecution, *id.* at 7–8.  But the presumption of eligibility for asylum  for applicants who, like Niyazov, have established past persecution, 8 C.F.R. §§ 1208.13(b)(1)(ii), 1208.16(b)(1)(ii), applies regardless of whether an applicant experienced past persecution in a proposed area of relocation, and the unlikelihood of future persecution in a proposed area is necessary but not sufficient to overcome the presumption.  Rather, to overcome the presumption, DHS must prove two things: (1) there is "a specific area of the country where the risk of persecution to the [applicant] falls below the well-founded fear level," and (2) "that proposed area is practically, safely, and legally accessible to him."  *Matter of M-Z-M-R-*, 26 I. & N. Dec. at 35; *see also id.* ("Under the regulation, even if an applicant is able to relocate safely, it may nevertheless be unreasonable to expect the applicant to do so.").  And the second inquiry requires the IJ to assess the reasonableness of relocation "under all the circumstances." *Id.* at 34 (quoting 8 C.F.R. § 1208.13(b)(1)(i)(B)).  The BIA has clarified that those circumstances may include "social and cultural constraints, such as age, gender, health, and social and familial ties." *Id.* at 34.  The inquiry thus requires the IJ to look well beyond the existence of persecution-level harm.

[10] According to the dissent, our opinion today holds that IJs must "exhaust every conceivable line of inquiry" regarding internal relocation, Dissent at 9, and serve as advocates for *pro se* litigants, *id.* at 13–14.  We disagree.  The subjects we have identified for further factual development were all raised by Niyazov in his asylum application or during his hearing.  Each topic bears on whether he could reasonably relocate within Uzbekistan, which is a dispositive issue for his asylum and withholding of removal claims. *See* 8 C.F.R. §§ 1208.13(b)(1)(i)(B), 1208.16(b)(1)(i)(B).  So we are merely applying guidance from our precedent that (1) the INA requires IJs to develop an applicant's testimony, particularly on dispositive issues, *see, e.g.*, *Toure*, 443 F.3d at 325; (2) an IJ cannot discredit a *pro se* applicant for lack of detail when the IJ did not request that detail, *see, e.g.*, *Senathirajah*, 157 F.3d at 220; and (3) we will remand where the IJ ignores evidence favorable to an applicant, *see, e.g.*, *Herrow*, 93 F.4th at 116.

16

2.

Above, we discussed how the IJ's failure to develop the record impacted Niyazov's applications for asylum and withholding of removal. That failure also affected the IJ's decisions with respect to humanitarian asylum and CAT relief. After all, the IJ was required to consider "the cumulative effect of [Niyazov]'s experience" to determine whether his "set of experiences rises to the level of a severe affront to [his] life or freedom" warranting humanitarian asylum. *Saban-Cach v. Att'y Gen.*, 58 F.4th 716, 728–29 (3d Cir. 2023) (citation modified). And the record of Niyazov's past incidents in Uzbekistan will inform the initial questions the IJ must address when considering CAT relief: "(1) what is likely to happen to the petitioner if removed; and (2) does what is likely to happen amount to the legal definition of torture?" *Myrie v. Att'y Gen.*, 855 F.3d 509, 516 (3d Cir. 2017) (quoting *Kaplun v. Att'y Gen.*, 602 F.3d 260, 271 (3d. Cir. 2010)). The applicable regulations "require the [IJ] to consider all evidence relevant to the possibility of future torture." *Id.* at 517 (citing 8 C.F.R. § 1206.16(c)(3)).

Although the IJ addressed some past incidents of persecution in the questions he posed to Niyazov during the merits hearing, the IJ failed to inquire at all about several other incidents that Niyazov reported in his declaration. Those include (1) an attack during which the police knocked Niyazov unconscious with a metal object; (2) an incident during which the police threw Niyazov and his family out of the house and beat and kicked them; (3) an incident where government officials sent a demolition crew to evict Niyazov and his family from their house by beating them; and (4) a campaign of

17

intimidation by local officials who took actions such as assessing citations with impossibly high fees upon Niyazov's family.

Moreover, at multiple points during the hearing, as Niyazov was beginning to describe an attack or harm that he suffered, the IJ changed the topic, never to return. For example, after questioning Niyazov about two incidents in which he was detained and beaten by police, the IJ asked whether Niyazov had been detained and beaten a third time. Niyazov answered that he had, but the IJ never asked about that third incident. Instead, after Niyazov asked to take a break because his blood pressure was rising and he "need[ed] time to recover," the IJ moved on to another topic. AR 232.

The IJ's decision denying Niyazov humanitarian asylum and CAT relief does not discuss many of the incidents Niyazov referenced in his testimony and declaration. Rather, the IJ states that the Uzbek authorities' "method of kicking [Niyazov] during detention as a method of torture" and the threats and harm those authorities' caused Niyazov's wife and son were not "atrocious form[s] . . . of persecution," without reference to the other incidents. App. 21. And, concerning Niyazov's CAT claim, the IJ simply stated that its previous discussion supported "very little likelihood of [Niyazov] experiencing torture again from any individual . . ." App. 23. But the incidents of past persecution that the IJ neither developed nor discussed "are important parts of the totality of the circumstances" relevant to the decision of whether to grant Niyazov humanitarian asylum, *Sheriff v. Att'y Gen.*, 587 F.3d 584, 595 (3d Cir. 2009), and they are material to whether he would suffer future torture and thus be eligible for CAT relief, *Myrie*, 855 F.3d at 516. Because the IJ did not mention these incidents, "we have no way of

18

knowing if [he] even considered" these incidents when making his predictive judgments about Niyazov's future treatment in Uzbekistan, *Sheriff*, 587 F.3d at 595, further demonstrating that we are unable to apply substantial evidence review on this record.

The IJ thus failed in his duty to develop the record on these claims. For that reason, we will remand for further factfinding on Niyazov's requests for humanitarian asylum and CAT relief.

*     *     *

For the foregoing reasons, we will grant the petition for review, vacate the BIA's order, and remand to the BIA with instructions to remand to the IJ for a new hearing on all of Niyazov's applications for relief.[11]

---

[11] In light of our disposition, we need not address whether the BIA erred in reversing the IJ's finding of past torture.

*Niyazov v. Att'y Gen.*, No. 24-3168

_____

HARDIMAN, *Circuit Judge*, dissenting.

Today the Court holds that the Board of Immigration Appeals erred when it concluded that a previously persecuted man who successfully relocated within his home country could do so again. The Court reaches this counterintuitive conclusion by disregarding the "substantial evidence" standard and by improperly expanding immigration judges' statutory duty to develop the record. For those reasons, I respectfully dissent.

## I

Ildar Ruzmetovich Niyazov entered the United States through Mexico in 2022. He was later detained in 2023 as the "subject" of a human trafficking investigation. A.R. 397. Removal proceedings followed. Niyazov then applied for asylum, withholding of removal, and CAT protection.

As the majority recounts, the IJ found that Niyazov experienced past persecution at the hands of local officials in Tashkent, Uzbekistan, in part because of his Tatar ethnicity. That finding gave rise to a rebuttable presumption of future persecution. The Government rebutted that presumption when it showed that internal relocation would be successful and reasonable. By remanding for further factual development, the majority opinion minimizes the import of Niyazov's two successful relocations within Uzbekistan, first to Xorazm in 2015 and then to Samarkand in 2021.

For a brief time in 2015, he went to live with one of his sisters in Xorazm after being targeted by local Tashkent authorities in a dispute over his house's compliance with municipal laws. Xorazm is some 1200 kilometers away from Tashkent. Niyazov and his family faced no "threat[s] or harm[]" while in Xorazm but returned to Tashkent several months later. A.R. 118. Back in Tashkent, the noncompliant part of their house was demolished following an adverse decision by the Uzbekistan Supreme Court.

Years later, in 2021, Niyazov and his family relocated to Samarkand, where his in-laws resided, about 300 kilometers away from Tashkent. As his counsel acknowledged to the BIA, Niyazov "was not harmed [by *anyone*] after 2021." A.R. 22. In Samarkand, he worked as a taxi driver, often driving back and forth between Tashkent and Samarkand. Niyazov's problems in Samarkand were minimal: he did not "get along," A.R. 252, with his wife's family and sometimes his passengers would spit on him because of his Tatar ethnicity.

In denying Niyazov's application for asylum, withholding, and CAT relief, the IJ explained that Niyazov's previous successful relocations to Xorazm[1] and Samarkand showed that he could successfully and reasonably relocate within Uzbekistan. The IJ

---

[1] I agree with the majority that the IJ analyzed Niyazov's 2021 relocation to Samarkand in greater depth than his brief 2015 relocation to Xorazm. But I disagree that the IJ found Niyazov could successfully relocate only to Samarkand. *See* A.R. 117 (explaining that the Government had met its burden of showing that Niyazov had "successfully internally relocated in the past and would be able to do so in the future" before describing Niyazov's relocation to Xorazm); *see also* A.R. 121 ("DHS has met its burden of proving by a preponderance of the evidence that there are multiple areas of Uzbekistan that are accessible to the applicant."). So while the Samarkand relocation was more essential to the IJ's analysis because of its recency, greater length, and Niyazov's stable employment there, the earlier Xorazm relocation also supported the IJ's conclusion.

emphasized the Samarkand relocation that immediately preceded Niyazov's travel to the United States-Mexico border. He explained that the familial tensions Niyazov experienced there did not put him in an "unlivable [] situation." A.R. 119–20. The IJ also noted that "local officials ha[d] not threatened, harmed, or otherwise targeted" Niyazov or his family since 2017. A.R. 123. Based on those facts, the IJ concluded that "what appears in this particular case is that there were personal situations within [Niyazov]'s family that led [him] to no longer wish to reside in Samarkand." A.R. 120. And "no cultural or linguistic barriers to relocation . . . prevented a safe and feasible relocation," so Niyazov's internal relocation would be "reasonable." *Id.*

The BIA affirmed the IJ's decision and Niyazov timely petitioned for review.

II

We review an IJ's factual findings for substantial evidence. *Toure v. Att'y Gen.*, 443 F.3d 310, 316 (3d Cir. 2006). Under that deferential standard of review, "administrative findings of fact are conclusive unless any reasonable adjudicator would be *compelled* to conclude to the contrary." *Shardar v. Ashcroft*, 382 F.3d 318, 323 (3d Cir. 2004) (quoting 8 U.S.C. § 1252(b)(4)(B)) (emphasis added). We will not disturb the agency's conclusions so long as its factual determinations are supported by "'specific, cogent' reasons such that [the] conclusions 'flow in a reasoned way from the evidence of record and are [not] arbitrary and conjectural in nature.'" *Toure*, 443 F.3d at 316 (quoting *Dia v. Ashcroft*, 353 F.3d 228, 250 (3d Cir. 2003) (en banc)).

Here, the IJ provided "specific, cogent reasons such that [his] conclusions flow[ed] in a reasoned way from the evidence of record and [were] [not] arbitrary and

3

conjectural in nature." *Toure*, 443 F.3d at 316 (citation modified). He explained that Niyazov had suffered past persecution in Tashkent but that the Government showed he could successfully and reasonably relocate elsewhere in Uzbekistan. As my colleagues note, the IJ found that Niyazov's issues "get[ting] along," A.R. 252, with relatives in Samarkand and some of his passengers spitting on him did not amount to persecution. *See Gomez-Zuluaga v. Att'y Gen.*, 527 F.3d 330, 341 (3d Cir. 2008) ("[P]ersecution, while not inclusive of every act that our society might regard as unfair, unjust, or unconstitutional, generally includes treatment like death threats, involuntary confinement, torture, and other severe affronts to the life or freedom of the applicant.").

Nothing in the record suggests that, while he resided in Xorazm or Samarkand, Niyazov "live[d] in constant fear of arrest, imprisonment, torture[,] death," or "every knock on the door." *Nsimba v. Att'y Gen.*, 21 F.4th 244, 255 (3d Cir. 2021). In Xorazm, Niyazov and his family "were not threatened or harmed." A.R. 118. And Niyazov did not testify to any persecutory acts after he relocated to Samarkand in 2021. *See also* A.R. 120 (concluding that "[t]he record does not indicate that [Niyazov]'s life or freedom or the life or freedom of [Niyazov]'s family members were in any way threatened or jeopardized while residing in Samarkand").

Because Niyazov spent a year in Samarkand without incident (and again, years earlier, had successfully, albeit briefly, relocated to Xorazm), the Government showed

4

that he could reasonably and successfully relocate within Uzbekistan.[2] On this record, a reasonable adjudicator would not be "compelled to arrive at a contrary conclusion." *Serrano-Alberto v. Att'y Gen.*, 859 F.3d 208, 212–13 (3d Cir. 2017) (internal quotation marks omitted). So the IJ's decision was supported by substantial evidence and we have no valid cause to disturb it.

The majority opinion sidesteps that deferential standard of review. It does not explain how the IJ's "findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record." *Toure*, 443 F.3d at 316 (citation modified). Instead, it claims the record is insufficiently developed for our review. So, on its telling, we cannot even reach the question of substantial evidence. For the reasons explained below, that conclusion is wrong. The IJ satisfied his statutory duty to develop the record and, as explained, his conclusions are supported by substantial evidence. I would deny the petition.

### III

I agree with my colleagues that IJs have a duty to develop the applicant's testimony, grounded in § 1229a(b)(1) of the INA. *Toure*, 443 F.3d at 325; *see* 8 U.S.C. § 1229a(b)(1). But the majority opinion expands that basic duty in a manner that morphs substantial evidence review into something resembling de novo review. And it does so just months after the Supreme Court unanimously held that we must apply substantial-

---

[2] The majority opinion says that the IJ "failed to apply [the] presumption" that internal relocation would not be reasonable. Maj. Op. 13. Not so. In his thorough analysis, the IJ made clear that "the [Government] ha[d] met its burden of demonstrating that relocation to Samarkand in this record was actually reasonable for [Niyazov]." A.R. 119–20.

evidence review to the BIA's persecution conclusions. *See Urias-Orellana v. Bondi*, 146 S. Ct. 845, 848 (2026).

Citing our decision in *Gambashidze v. Ashcroft*, 381 F.3d 187, 193–94 (3d Cir. 2004), my colleagues remand this case for a new hearing because the IJ failed to develop the factual basis for internal relocation. But Niyazov's case is nothing like *Gambashidze*, notwithstanding how the majority opinion recasts that precedent today. *Gambashidze* assessed for the first time 8 C.F.R. § 208.16(b)(1)(i)(B), which was a new regulation involving internal home country relocation. *Id.* at 188, 191–92. The asylum applicant—a politically active opponent of the then-President of Georgia—relocated to another part of the country for eight months before fleeing to the United States. *Id.* at 188. The relocation regulation became effective between the IJ's hearing and the BIA appeal. *Id.* at 192. Given those circumstances, the "slim record," *id.* at 189, was devoid of *any* factual finding regarding whether Gambashidze "was able to live freely" during his relocation or if he "had to remain in hiding underground," actively on the run from his persecutors, *id.* at 193.

Niyazov's case was, of course, litigated decades after the relocation regulation was established. And unlike *Gambashidze*, Niyazov's record provides substantial evidence of his experiences during his year in Samarkand. There were familial tensions and the occasional gross acts of passengers, but nothing more. In *Gambashidze*, the record revealed nothing about the applicant's relocation experience. The IJ's detailed factual findings about Niyazov's life in Uzbekistan—from Tashkent to Xorazm back to Tashkent and then to Samarkand—are quite literally the opposite of the barren record in

6

*Gambashidze*. Based on those factual findings, the IJ concluded, and the BIA agreed, that Niyazov managed to live freely as a Tatar in Samarkand. And despite the majority opinion's suggestion to the contrary, the fully developed record does not support the contention that Niyazov "t[ook] up political activism advocating for Tatar rights." Maj. Op. 4 (appearing to rely on Niyazov's asylum application, in which the preparer wrote, "I will be arrested and killed because of my Tatar nationality (ethnicity), as well as because of my fight for the rights of Tatar people." A.R. 264–65). So the majority opinion's reliance on *Gambashidze* is misplaced.

The majority opinion also tries to find support for its conclusion that the record was insufficiently developed in *Sheriff v. Attorney General*, 587 F.3d 584 (3d Cir. 2009). Relying on that case, it says that "we have no way of knowing" if the IJ "even considered" each specific incident Niyazov experienced throughout his life in making "predictive judgments about Niyazov's future treatment in Uzbekistan." Maj. Op. 19 (citation modified). This claim is all the more perplexing given that the IJ *did* consider Niyazov's life experiences—taking all record evidence into account, he found that Niyazov had previously been persecuted. The IJ just concluded that Niyazov was unlikely to suffer *future* persecution because he had already successfully relocated after the persecution ceased. In any event, *Sheriff* cannot bear the weight the majority opinion places on it. There, we concluded that the record was insufficiently developed in part because the BIA "failed to discuss" record evidence that a persecutor "burned Sheriff's home to the ground, murdered her mother and raped her daughter in front of her, shot her father and then refused to allow him to leave the country for medical treatment, abducted

7

her other daughter, and murdered the woman with whom she was staying in Guinea" *at all*. *Sheriff*, 587 F.3d at 595. The BIA's failure to "mention any" of those horrific events in Sheriff's case is materially different from its (and the IJ's) thorough analysis of Niyazov's application.[3] *Id.*

Besides, the agency is entitled to a presumption of regularity. *See Darby v. Att'y Gen.*, 1 F.4th 151, 166 (3d Cir. 2021). And even when we have been critical of the BIA for supposedly "ignoring" evidence in the past, we have been clear that the "IJ need not address every piece of evidence in the administrative record." *Herrow v. Att'y Gen.*, 93 F.4th 107, 116 (3d Cir. 2024). The majority opinion pays lip service to that principle but nevertheless faults the IJ for not providing an independent exhaustive analysis for every single experience Niyazov alluded to in his testimony and application. *But see* A.R. 113 (the IJ explaining that "all evidence was considered . . . even if not specifically mentioned in [his] decision"), 180 (IJ to Niyazov: "I reviewed all the evidence that you submitted together with your amended asylum application."). When we parse an agency's opinions

---

[3] The majority opinion also cites *Senathirajah v. INS*, 157 F.3d 210 (3d Cir. 1998), for the proposition that "an IJ cannot discredit a *pro se* applicant for lack of detail when the IJ did not request that detail." Maj. Op. 16 n.10. That case is not on point either. As the majority opinion acknowledges, the "IJ found Niyazov credible and also credited Niyazov's wife's affidavit and letter regarding the family's treatment in Uzbekistan." Maj. Op. 3. So the IJ did not "discredit" Niyazov for failing to provide enough detail. Instead, he considered Niyazov's fulsome responses and simply concluded that he was not likely to suffer future persecution and that his relocation would be reasonable under the circumstances. Besides, after our 1998 decision in *Senathirajah*, Congress passed the REAL ID Act in 2005. Among other things, the Act lowered the bar—*i.e.*, made it easier—for IJs to make adverse credibility determinations. *See Chukwu v. Att'y Gen.*, 484 F.3d 185, 189 (3d Cir. 2007) (describing this change); *see also* 8 U.S.C. § 1158(b)(1)(B)(iii).

for imperfections and second guess its fact-bound conclusions, we risk undermining the scheme the INA enacted.[4]

Yet the majority opinion plows onward, faulting the IJ for not asking various questions that this Court, in the fullness of time, proffers. The majority opinion's preferred lines of inquiry for the IJ on remand include: (a) "the treatment of the Tatar ethnic minority"; (b) "the safety of Niyazov's adult son . . . and the inquiries the son gets about Niyazov's whereabouts"; (c) "[w]hich actors were involved in the suspicious 2015 hit-and-run car crash that killed Niyazov's sister"; (d) "Niyazov's political activities for Tatar rights"; and (e) "[t]he treatment of the Tajik ethnic group." Maj. Op. 13–15.

But by holding that IJs must exhaust every conceivable line of inquiry before determining that applicants can successfully and reasonably internally relocate in their

---

[4] The majority opinion does not claim that Niyazov's proceedings were *constitutionally* deficient, which would provide another potential "exception" to substantial-evidence review. We have found procedural due process violations only in egregious cases, like where the IJ was hostile to the petitioner, focused on irrelevant issues, or failed to make factual determinations altogether. *See, e.g.*, *Serrano-Alberto v. Att'y Gen.*, 859 F.3d 208, 223–24 (3d Cir. 2017) (the IJ used "a hostile and demeaning tone," focused on irrelevant issues, "brow beat[]" the petitioner, continually interrupted the petitioner, and made factual findings that were directly contradicted by the record); *Wang v. Att'y Gen.*, 423 F.3d 260, 269–70 (3d Cir. 2005) (the IJ made "intemperate remarks," relied on "irrelevant character evaluations," and "attack[ed]" the petitioner's life choices); *Cham v. Att'y Gen.*, 445 F.3d 683, 691 (the IJ "presumed [the applicant's] application to be without merit before even a shred of testimony had been presented," "continually abused" the petitioner, and "belligeren[tly]" questioned him). No one contends that the IJ's behavior in this case resembled the belligerence and disrespect we critiqued in *Serrano-Alberto*, *Wang*, and *Cham*. Nor, as I have explained, is this case anything like *Gambashidze*, where the record was bereft of facts related to the applicant's prior relocation experience. *See Gambashidze*, 381 F.3d at 193 ("The record [did] not disclose whether [the applicant] . . . had to remain [] underground" in hiding from his persecutors).

home countries, the majority opinion has expanded the INA—specifically, the IJ's statutory duty to develop the record—beyond recognition. The IJ here *did* develop the factual record on the essential question of relocation in Uzbekistan. Consider this colloquy about Niyazov's time in Samarkand:

> IMMIGRATION JUDGE TO NIYAZOV
>
> Q: Okay. Were you safe in Samarkand?
> A: I couldn't live there because my wife's relatives . . . don't like me because I'm Tatar.
> Q: . . . [Y]ou lived in Samarkand for a year. Were you living on your own with your family?
> A: Well, there, we couldn't make it. We have (sic) rented the house. It didn't go well, and in Samarkand, it is even worse. They hate these Russian Tatars.
> Q: Okay. You mean—it couldn't go well, you mean employment-wise, you were not doing well or something else?
> A: It was something else because my children also were already speaking and articulating in Tashkent style and they couldn't get along in that place.

A.R. 252–53.

After a series of questions about Niyazov's time in Samarkand, including inquiries into what did not "go well" there, A.R. 253, Niyazov offered only that he did not get along with his wife's family members and his children struggled to assimilate because of their Tashkent accents. It's also true he stated vaguely that "[t]hey hate" Tatars, but he never described any incidents of persecution during his family's time in Samarkand. A.R. 253. Nor does every act of discrimination qualify as persecution. *See Lukwago v. Ashcroft*, 329 F.3d 157, 167–68 (3d Cir. 2003) ("Persecution 'does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional.'" (citation omitted)). Rather, Niyazov "no longer wish[ed] to reside" in

10

Samarkand because of "personal situations within [his] family." A.R. 120. Because Niyazov had already successfully relocated (including to Samarkand immediately before coming to the United States), the IJ's conclusion that the "proposed [relocation] area [was] practically, safely, and legally accessible to him" was quite rational. *Matter of M-Z-M-R-*, 26 I. & N. Dec. 28, 34 (BIA 2012).

Throughout the hearing, the IJ explored each part of Niyazov's claims and asked detailed questions about his experiences in Uzbekistan (including, but not limited to, the death of his sister in 2015, the demolition of his house, the related police attacks that followed, and other negative experiences he and his family had in Tashkent).

Even so, the majority opinion speculates that Niyazov may have revealed other incidents of persecution (or other reasons that would make relocating to an area he had already recently successfully relocated to unreasonable) if only he were asked the right questions. But the IJ specifically asked Niyazov about his time in Samarkand and Niyazov responded accordingly—citing only his contentious relationship with his in-laws, the occasional gross acts of his passengers, and his children's adjustment to school in a new region. The IJ did nothing wrong by declining to inquire further into Niyazov's family problems. He provided a fundamentally fair hearing—Niyazov was "allowed to make arguments on his [] behalf," and he received "an individualized determination of his [] interests." *Abdulai v. Ashcroft*, 239 F.3d 542, 549 (3d Cir. 2001) (internal quotation marks omitted).

Furthermore, each of the "indicia of reasonableness" of internal relocation listed by the majority opinion were either addressed by the IJ or are so general as to be

11

irrelevant to the internal-relocation inquiry. Maj. Op. 13. For example, the majority opinion remands for more factual development on the treatment of Tajiks and Tatars in Xorazm and Samarkand (as well as those ethnic groups' treatment throughout all "potential areas for relocation," Maj. Op. 13). But the IJ already made an individualized determination that, though Niyazov experienced past persecution in Tashkent, he did not experience continued persecution after relocating. The IJ acknowledged that "individuals of Tatar background . . . experience discrimination in Uzbekistan" and that Niyazov testified that his family members "did not like him because of his racial background." A.R. 120. But the IJ was not persuaded that Niyazov's family problems "put [him] in an unlivable [] situation where he was not able to freely have complete and full agency in Samarkand." *Id.* The IJ explained that Niyazov "is an able-bodied head of [] household who" does not have to live with family members who do not like him (because of his ethnicity or otherwise). *Id.* So the IJ already reasonably concluded that relocation would be reasonable. The majority opinion next questions which specific actors were involved in the 2015 car accident that killed Niyazov's sister, but disregards that the IJ already assessed that accident's relevance in his determination. And even regarding more potentially relevant factual issues, like who continues to "question[] [Niyazov's] son about his father's whereabouts," Maj. Op. 14, I disagree with the majority opinion's myopic view of the record. The IJ asked where those actors were located. The predictable answer? Tashkent. *See* A.R. 239–40. That response supports, not contravenes, the IJ's determination about relocation. *See also Gambashidze*, 381 F.3d at 192 (noting that "the regulation [8 C.F.R. 208.16(b)(1)(i)(B)] envisions a totality of the circumstances inquiry"

12

depending on all the circumstances of the case, not a compulsory checklist like the majority's ex post facto rubric).

The majority opinion also criticizes the IJ for "chang[ing] the topic" after Niyazov began "to describe an attack or harm that he suffered." Maj. Op. 18. That critique is unfair. The record shows that the IJ chose to pursue a new line of questioning only after sufficiently developing facts relevant to the previous line of questioning. For example, at one point the IJ asked Niyazov about when he was detained and beaten by police officers in Tashkent. The IJ then asked whether he was ever again detained. Niyazov replied "no" and asked for a break. The IJ granted a five-minute break and, once back on the record, asked Niyazov about a 2005 car accident. Moving on to a new subject, especially after Niyazov's answer foreclosed additional inquiry, is not a failure to develop the record. If anything, the IJ dutifully developed the record by moving the proceeding along. The majority opinion's attempts to paint this record as incomplete are unpersuasive.

For the reasons discussed above, the IJ did not "ignore evidence that is favorable" to Niyazov. Maj. Op. 11 (citing *Herrow*, 93 F.4th at 116). He explored Niyazov's claims in detail, considered all the evidence in the record, and provided a fundamentally fair hearing. So ordinary substantial-evidence review—not a workaround or exception—is appropriate. And for the reasons discussed above, substantial-evidence review compels the denial of Niyazov's petition.

IV

The majority opinion also stresses a heightened duty in pro se cases. It faults the IJ for failing to "scrupulously and conscientiously probe into, inquire of, and explore for all

13

the relevant facts." Maj. Op. 12 (citation omitted). To support that duty, it relies mostly on out-of-circuit authority, including a recent Fourth Circuit case, *Diahn v. Blanche*, 175 F.4th 291 (4th Cir. 2026). But those cases, particularly the *Diahn* court's expansive view of the IJ's duty to develop the record when an alien proceeds pro se, are unpersuasive. They ultimately rely on a policy judgment that the nature of asylum cases justifies additional burdens on IJs to "help" pro se applicant bring their claims. *Quintero v. Garland*, 998 F.3d 612, 634, 638–39 (4th Cir. 2021). I respectfully disagree with my colleagues' decision to expand the IJ's statutory duty in the same manner here. In doing so, the Court converts a straightforward statutory directive for IJs to "administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses" into a tool to micromanage immigration proceedings. 8 U.S.C. § 1229a(b)(1).

In faulting the IJ for violating a heightened duty that we did not recognize until today, the weight the majority opinion places on Niyazov's pro se status also blurs the lines for IJs—are they neutral adjudicators or advocates, or sometimes both, depending on the status of the litigant before them? What once was settled now seems uncertain. *See Abulashvili v. Att'y Gen.*, 663 F.3d 197, 207 (3d Cir. 2011) ("[A]n immigration judge has a responsibility to function as a neutral, impartial arbiter and must refrain from taking on the role of advocate for either party." (citation omitted)).

But even if the IJ's duty to develop the record here is as expansive as the majority opinion implies, I do not agree that the IJ failed to assist Niyazov for the same reasons the IJ did not fail to develop the factual record under our extant precedent. The IJ *did* "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant

14

facts." *Diahn v. Blanche*, 175 F.4th 291, 301 (4th Cir. 2026) (citations omitted). Over the course of six appearances, including two hearings, the IJ asked open-ended and detailed questions about Niyazov's experiences in Uzbekistan from his childhood to his final days there, repeatedly encouraged him to speak to an attorney, and—after detailed factfinding—made an individualized determination of his case in a thorough opinion.

In a perfect world, the IJ might have conducted the hearing as the majority opinion now instructs it to do on remand. But the IJ's duty to develop the record is not an "all-purpose tool for judicial construction of a perfect world; and when we ignore [the INA's] text in order to make it that, we often find ourselves swinging a sledge where a tack hammer is needed." *Padilla v. Kentucky*, 559 U.S. 356, 388 (2010) (Scalia, J., dissenting).

\* \* \*

Substantial evidence supports the agency's conclusion that the Government carried its burden of showing that Niyazov could successfully and reasonably relocate within Uzbekistan. I would deny the petition.

15